Argentina and Bison B against the Republic of Argentina. I understand counsel in both of these cases have worked out their own arrangements for who will argue when, which is agreeable to me, and we will proceed if you'll make sure to identify who exactly you are and whom you represent. Good morning, and may it please the Court, I'm Sabin Willett, I represent Bison B, and I hope to touch on the acknowledgment issue, common to both appeals, and a pari passu point raised only in the Bison B appeal. We can focus our acknowledgment case best on one page of the appendix. It's page 540 of the Bison B appendix, which is a summary of what Argentina said in September 2017 it owed. Mr. Willett, what page? Page 540 of the Bison B appendix, Your Honor. Bear with me one second. It's not the joint appendix, is that right? It's the joint appendix in the Bison B appeal, I think. Mr. Boccuzzi will correct me if I'm wrong. But at the head of the page it says central government debt by instrument and term type. You go ahead. Well, it breaks the debt into subcategories. Subcategory 5, subtotal debt not submitted to the exchange. Everyone agrees that the Bison B and Luchesco debts are in that subcategory. Where is it on 540? Your Honor, if you look down the page at the heading in bold, Roman V, subtotal debt? Yep. Okay. Everyone agrees, this is at page 14 of Argentina's brief in the Bison B case, that the bonds at issue in this case are within that category. If you look then up the page to Roman II, you have total government debt, 3 plus 4 plus 5. Total government debt, according to Argentina at the end of September 2017, includes these bonds. Not just the principal, but the interest. All of the interest that has accrued through the date of this statement. But are we supposed to ignore the 12 years of history where Argentina said we're not going to pay them? Yes, Your Honor, for purposes of the statute of limitations. The rule in New York is if you have a writing, one writing, in which the defendant either promises to pay or acknowledges a debt. And do you have any New York case in which something of this sort, a balance sheet, not something, not an acknowledgment directly to any particular alleged creditor, but a balance sheet that indicates what could well be considered as contingent liabilities because matters are under litigation, et cetera, extends the statute of limitations? Well, Your Honor, let's be clear. This cannot be considered contingent. There's no reference on this page to any dispute or contingency. Instead, they say this is part of the total government debt, period, full stop. Do I have cases? Yes. Chase Manhattan Bank, it's a First Department decision, page 13 of our opening brief. Banco do Brasil, same page of our opening brief, First Department, 2000. Clarkson Company. These are cases that say that a reference to a debt in a balance sheet constitutes an acknowledgment. Yes. And Judge Owen in Clarkson Company also cited in our brief. In those cases, was there any contrary evidence, like 12 years of a lock law and various statutes passed by the Republic of Argentina saying we're not paying any of this? Well, Your Honor, I have to assume that in every case something like that exists. Why do you assume that? Because you wouldn't have litigation otherwise. The reason that there is litigation is someone is disputing the debt. Now, they're making a statute of limitations argument as well. And the court says, well, the only issue on statute of limitations is, is it a live claim or is it a stale claim? The question is, it's live under New York law if they have acknowledged it. But to come to your contextual question, Your Honor, we did have this 12 years of history. We're all weary of it, frankly. And I think Your Honor sat on at least one of the panels in 2016. But the fact of the matter is that everyone on this Court who doesn't own some of these bonds or have other reason to be disqualified has sat on one or more cases arising out of this default. I know it well, Your Honor. I've been waiting three years for a decision in one case that was argued three years ago in November. But a different panel. You should let us know about that. Sorry, Your Honor? You should be sure to let us know about that. Okay. We will do. Thank you. It wasn't the case I sat on. No, it wasn't, Your Honor. That decision came down very quickly. And in that decision, Your Honor, your panel wrote you were not deciding the question of the bonds who didn't settle. They might proceed to negotiate or, in this case, litigate. You effectively predicted what's happening this morning. But my point was that you've talked of you mentioned 12 years of history. Well, in 2016, at the time that Your Honor and your colleagues ruled. Consistent history, which is we are not going to pay those bonds according to their terms. No, inconsistent. Twelve years. I mean, it's inconsistent in the sense that there were various offers made in 2005, 2010, and then with the propuesta. But during that whole time, Argentina was clear, we're not paying the bonds according to their terms. Is that right? It's partially right. It's right through 2016. What's partially wrong about that? Because in 2016, Argentina abrogated those lock laws. That's page 369 of our appendix. The world changed. And they started, in 2010, they started announcing a different kind of financial statement, of which page 540 is an example. They acknowledged the debt. And this case was dismissed below on a statute of limitations claim. Maybe they want to fight us on the merits, but the claim is a live claim. If I can press on to the Pari Passu claim, I see that the red light's on. Go ahead. Thank you, Your Honor. There we made a really simple argument. We made all of the facts which had given rise to an external leg claim were facts, not all of them, but many of them. And all that had happened since 2012 were within anybody's view of the statute of limitations and had resulted in the same result to us. But if I can focus the Court's attention on something new about this case, which is the internal leg, what we said was that in the settlement in 2016, Argentina had taken its fiscal agency agreement bonds, all of which contained the promise that all of the bonds will be treated Pari Passu and without any preference among them. And it had created preferences. If you have a lawsuit, you get one settlement. If you have a lawsuit and an injunction, you get another settlement. If you don't have any of that, you get nothing. They created broad preferences, which violated the internal leg. That was only two years ago, or two years before we filed the complaint. And we have the simplest kind of contract claim that says we have the expectation measure of damages. You promised that all the bonds within this boat would sink or swim together. You've broken that promise two years ago. We're entitled to a damage claim. Why doesn't Aurelius resolve this, lifting the injunctions? Your Honor, the trade in Aurelius, which you affirmed, was that those parties which had injunctions had to be paid as consideration for the court lifting the injunctions. But you specifically said in Aurelius, I think it's at page 108 of 644 Federal Appendix, individual bondholders who have not settled are free to continue litigating, negotiating. Nothing that we are doing hamstrings their rights. So nothing about Aurelius affects the outcome of this case. I'm over my time, and I have reserved a minute. You have reserved a minute. Thank you, Your Honor. Ms. Smolnik is up. Good morning, Your Honor. I'm Mary M. Smolnik, representing Luchesco, and as far as the argument for 211, Bison B as well. I think that there's no dispute here that what we're dealing here is a bond, which is what's required under 211. The only issues that have been raised is whether the term any person encompasses a governmental agency or a sovereign. And we now have court of appeals law that says the term any person changes the meaning of the word person, and the Supreme Court even recognized that this recently, saying that when you add the word any to the word person, then the definition of person that normally would exclude a sovereign no longer applies. That's an issue that is settled, and to continue arguing and to say that in the face of decisions from the district court, saying that the word person in subdivision B includes a sovereign, and then say, but the word any person wouldn't include a sovereign, flies in the face of all the laws of statutory construction. Do you disagree that the legislative history of 211 really just deals with the state of New York bonds and municipal bonds? The legislative history was talking about the unfairness that had crept up, in part because they changed the statute of limitations from 20 years to 6 years. And in the interim, a lot of different things happened, including what has happened here, which is there were bans and bars on people being able to collect on these bonds. And therefore, the state of New York wanted to be able to pay them. So, yes, that was the impetus, but the statute was not at all limited to state of New York. And the fact that it lists the state of New York, you know, any person in the state of New York and public and private corporations, doesn't limit it any more than the fact that it excludes a long list of different types of regulated industries and doesn't exclude sovereigns there. I think in terms of that argument, it's really a wash. They didn't include it, but they didn't exclude it when they have lists of both of them. So I think that the argument that it applies to a government is certainly settled in our favor. The second issue that's raised is whether these were advertised in a newspaper of general circulation. So the argument comes down to, is the bulletin considered? And Argentina asked this Court to take a very literal view and says, it has to be advertised for bids to underwriters. And if it's advertised for bids to the direct purchaser, that doesn't qualify. Now, I'm not sure why that should be, because the statute is not designed to protect underwriters. It's designed to protect the bond buyer. So the real reason for the advertisement is so that there's no dispute as to the terms, because they're advertised in a newspaper of general circulation or in something that's available to everybody. And the Federal Register, a newspaper of general circulation? No, but the Federal Register doesn't include ads, which the bulletin, if you look at page 866 of the Luchesco Joint Appendix, and scattered from A424 to A451, includes ads, different services being advertised. Ads about bond sales? They advertise, well, they have the list of the Argentinian bonds and the name of the underwriter and where they can be purchased. But the pages are just the ads? No, the pages I'm talking about is general ads, just to distinguish it from the Federal Register. But they're not ads selling bonds, right? No, but the way Argentina argued was that the bulletin is like the Federal Register, because it doesn't have ads, but it does have ads. So it's not like the Federal Register. I've never looked and seen an ad for anything in the Federal Register, whether it's attorneys or debt collection or anything like that. Maybe we're missing a chance. There's advertising on everything else. That's right. Maybe you can have revenue. If there are ads in the Federal Register, considering how many people read it religiously. Right. If I may then move on to the issue of the toll. What we're dealing with here is a country that passed a law that didn't just say we're not going to pay. They said it is illegal to make this payment. And that bar has been used by Argentina repeatedly to avoid its obligations on the judgments. That's exactly what the New York Court of Appeals has recognized can create a toll. And the fact that we could not say that it was due and payable, which is what the cases require, is a bar. People could plead it, which is exactly what the toll situations raise where the courts have said, yeah, you could come in and say, you know, I filed a notice of claim even though I didn't. There's nothing to stop you. But we don't want to encourage that. So here, while Argentina says that it doesn't require that it be payable as long as liability is established, that was actually rejected by the Court of Appeals in the Phoenix case where that was the argument made by the defendant. They said that it was, liability was established, and it's at page, let me see which one is in New York, page 144. And that was enough to trigger the statute. And the Court of Appeals said no because it wasn't payable at that point. So, and if you look at A465 of our appendix, the Luchesco appendix, there the fiscal agency agreement actually makes a distinction between when the bonds are due and when they're payable. And they say the bond may be due, but if we haven't transferred the money, they're not payable. So it is a significant term, which we could not actually plead during the time that these statutes were in effect. The fact that other people did plead it and obtain judgment doesn't change the fact of when a cause of action accrues. And certainly all the requirements for a toll are present here. As the Supreme Court recognized in American Toll, and the Court of Appeals has recognized repeatedly, a toll is proper when the defendant knows the claim, knows that the claims are coming, knows the details. It's not affected by the delay. And that's exactly what we have here. They know to the penny how much money is owed on these bonds, and they know which claims are going to be coming. So there's no harm here that they can point to, no prejudice caused by the fact of a toll being imposed. The theory being that everyone knows that Argentina is going to resist payment. So why should we even think of statutes of limitations? Well, it's not that everyone knows. It's the fact that Argentina has passed a law saying we're not going to make payments. That's very different than saying I refuse to pay you or even that I don't have the money to pay you. They've always said this. They've said it. Since the beginning of the 20th century, they've said it. Right, but they've said it in the sense of — In other words, what I'm suggesting is that your suggestion of some sort of sympathy that might be gained by an argument in these circumstances is hard to carry when, after all, if ever the concept of caveat emptor meant anything, it certainly is the matter of Argentine bonds. Well, considering that in 2016 they made a promise that they're going to pay everybody, 100 percent of our creditors, and that was put in writing by counsel for Argentina. And your clients believed it. And our clients believed it. Thank you. Very sympathetic. Now, here's someone who confirmed to us that the Argentinians never pay. Good morning, Your Honor. Carmine Bocuzzi from Clerigotli. We paid you, though. For the Republic of Argentina. Thank you, Your Honor. That's different. Lawyers need to be paid, Your Honor. Yes. Some of you in my family. Thank you. So just to start, I think it will be easiest to run through the issues as counsel ran through the issues on their side. And to start with the acknowledgment, if you look, counsel pointed you to page A54, which is a page from the quarterly statement. But then within that same document on page A542, there is a distinction of the two categories. Up at the top, it lists out debt at normal payment status. And then two lines below, separate from the category of debt that is at normal payment status, you have the category debt not submitted for exchange, which we all agree is the category that includes appellant's debt. And then if you go back to the page A540, which counsel pointed you to, the reference to the subtotal of debt not submitted to the exchange, there's a reference there to decrees. And those two decrees are the decrees that authorized the two exchange offers that occurred and make very clear that this debt, their debt, needs to be restructured. In other words — Help us a little bit here, Mr. Jacuzzi. Those of us with eyeglasses may have trouble. We're on page A540. A540? Yes. If you go down, see the dark bars? Yes. If you go down, the dark bars have little Roman numerals at the far left. So go down below about halfway down the page, a little below that, there's a Roman 5. Right. And it says subtotal debt not submitted to the exchange, docs. That's for decrees 1735-04 and 563-10. And what are we supposed to infer from this? So what I'm saying is this category of debt, which is the category that includes appellants' bonds, specifically references the two decrees that says this category of debt needs to be restructured and not paid according to its terms, which is, of course, what you need to have an acknowledgement under 17101. How do we know that by looking at A540 at Roman V? What is it? Where is it that we are able textually to move to the conclusion you are submitting to us? I think you would need to refer to those statutes, and that would spell out what this debt is subject to. But in the same document, which is where I started, if you then flip two pages in the appendix, 542, you then have the important contrast. So up at the top of 542, under total government gross debt, the first bullet is at normal payment status, and then the third bullet is not submitted for exchange. So not submitted. Let me follow up on Judge Cabranes' question on Roman V on 540. You're representing docs 1735-04, and the other one are statutes, Argentine statutes. Is that right? How would you know that? How would we know that? I think just a user of the document would be able to infer from reference. That's the normal citation for a decree. And if you Google it, you find it's available on the Internet. It's in the district court record, though I don't think it was before the court in the motion to dismiss. But, of course, the district court was aware of all this history and the exchange offers. And the exchange offers. But you're saying these are the very decrees or statutes that the plaintiffs, in effect, are relying on to say this debt wasn't payable during all of those years. Essentially, yes. They train in the Locke law, but the Locke law worked with these decrees. So the Locke law was saying, look, we're not going to pay and we'll only, quote, unquote, resolve debt pursuant to the exchange, see these two decrees, essentially. But these are the decrees that prohibit payment of these very bonds. Yes, because they only contemplate that these bonds are exchangeable, essentially. And if there's any further doubt, and there really couldn't be, later on in this document, and there's a site I just want to give you for the bond at normal payment status, if you go to A503 to 523, so it's 20 pages. You don't have to slog through it now, but I will represent to the Court. I don't think there's any debate. That those pages are projections of payments for the bonds at normal payment status, which, of course, don't include the plaintiff's bonds. And all this goes to the requirement under the statute, and as interpreted by the New York Court of Appeals since 1902, the Connecticut trust case, which says you can have nothing inconsistent with an intent to pay. And that essentially means an intent to pay the bonds according to their terms. And importantly, because plaintiffs make this argument in their brief, and they say, well, acknowledgment is just saying I recognize the debt exists. That is not correct. The Connecticut trust case explicitly says that if all you're doing is identifying the debt, that's not enough. You need to show an intent to pay it or, at the very least, nothing inconsistent with payment on the bonds. And so the plain text of this document, the quarterly report, refutes that. And I would also the other reference that you agree that in essence the statute is making a kind of estoppel, that if the debtor is sort of stringing the creditor along with, if not an explicit promise to pay, at least something that says, yeah, we owe you and doesn't say we're not going to pay, then that kind of stops them from coming back later and relying on the statute of limitations if the creditor was lulled by that into not filing suit. I think that's exactly right, Your Honor. And certainly no one can claim here that there was any lulling going on by Argentina. And I think that also dovetails with the cases that my adversary cited when you asked the question, is it enough just to list a document on a financial statement, list a debt in a financial statement? Those cases involved debtors sending the financial statement. Yeah, that's certainly true of Banco de Brazil. Is that also true of the Chase Manhattan case? I believe so, yes. Yes, I have it grouped that way in our briefs. And when I looked at it a few days ago, it all seemed consistent and to work. And, in fact, we cite the black letter law from cases on 20 of our briefs, and I think that's the Bison Bee brief because we have a brief in each action, that as a general rule, quote, financial statements alone are insufficient to restart the statute of limitations. That's the Moore case. We cite the Sciadis case. The mere fact that the debt was carried on the defendant's books would not, in and of itself, constitute the required acknowledgment. And the National Westminster Bank case as well. All go to the fact that a mere listing of the debt, which, of course, we're not in that land, right? We're in the land of you've listed it and you've made it clear it's a separate category of debt, different from normal payment status and subject to these decrees. So I think the acknowledgment argument fails. And I think also going on to the Parry-Passu argument, that fails as well. And I think here this Court's recent decision in Mendoza, this follows from the Mendoza decision. In Mendoza, the plaintiff said, I have a bond, I sued well past the statute of limitations for maturity, but the bond says you, the province of Mendoza, are obligated to pay interest until principle has been paid. Principle was never paid. Therefore, I still have this floating interest claim I can bring. The Court of Appeals on certification from this Court rejected that. This Court, when it came back from the Court of Appeals, said if you have no right to the principle, you can't then claim the contractual interest rate. They fall together. Here, the Parry-Passu claim is about the payment obligations. So if you have no right, you're time-barred on your payment obligations, you can't say, well, there was a Parry-Passu obligation in 2016, and therefore I have a claim now for damages under this Parry-Passu theory. Putting aside the Parry-Passu clause, it's just a covenant. It's not the promise to pay. The promise to pay is what they're pursuing, and the promise to pay, of course, is time-barred for them. So the Parry-Passu claim fails. The argument is about statute of limitations, right, Mendoza? Say it again. That whole argument you just made is about statute of limitations. Correct. Mendoza. Correct. Do you think Aurelius resolved the Parry-Passu question itself? Whether there is a breach here of the Parry-Passu clause? I think it did. I think for so counsel is saying basically the settlement violates the internal limb of the Parry-Passu clause. And so he's asking this Court to accept that when this Court vacated these injunctions and found that the Parry-Passu clause was no longer being violated, in fact, it was allowing to proceed a violation of the Parry-Passu clause. But on the basis of the injunction factors, not on the issue of law of whether the Parry-Passu clause was violated, right? You were on the injunction factors, Your Honor, but that considered what you had before it. But if we want to go to the merits, the 2012 decision by this Court, the first Parry-Passu decision there, 2012 and 2013, said an important thing. It said a repurchase of debt would not violate the Parry-Passu clause. And these settlements are basically Argentina going in the market and people saying I have bond claims, and they settled them at a discount. And the Court said specifically, because a repurchase is essentially the purchase of a bond at a premium or a discount, that doesn't violate the Parry-Passu clause. So that's number one. And number two, paying one creditor and not another creditor is not a violation of any limb of the Parry-Passu clause. This Court has now said that twice. It said it in 2012. It said it in 2013. They said we have never held, and this Court has said, never held that the payment of one creditor and the nonpayment to another creditor is a violation of the Parry-Passu clause. So walk me through this. When do we have a violation of the Parry-Passu clause? The Court's going to ask, what are the situations that remain after your argument is accepted in its entirety? I think what remains is that if there is a law enacted, and this Court in 2012 specifically cited the Locke Law, which was repealed as part of the propuesta, that is read by this Court or understood by this Court as legally subordinating some class of debt, that and the Court in 2012 said, other conduct, which they found to be extraordinary recalcitrant in refusing to treat the debt as in line with other classes of debt, that is what these cases say is a violation of the Parry-Passu clause. Isn't that what they're arguing, in effect? Well, but they're not pointing to any Locke Law that doesn't exist anymore that subordinates their debt. They're just saying that they want to settle and they want more money. And don't forget, in the context of this oral argument, it's really about statute limitations. They're saying we just want to settle more of the debt. But didn't the propuesta rank debt? I mean, didn't it say people who had to – holders who had – were subject to the injunction get X, that those who were not subject to the injunction get X minus something, and then those clients get Y – get X minus Y? It didn't rank debt because a ranking of debt would be, you know, this bond is going to get paid this, that bond is going to get paid that. Here, the 70 percent, the so-called Parry-Passu offer or standard proposal was available for any litigant, no matter what debt they held, who had a Parry-Passu injunction. The standard offer was for any bondholder with an eligible bond who would get 150 of their principal. And so you had debt that was in both those. And that – yeah, it was less. I think for some people the math might work in such a way that it could flip. But by and large, yes, the standard offer was less than – than the Parry-Passu. And then those who didn't accept the Propuesta offer got what? They're still – they're still out there. They're still being discussed. They've – they've been settling. The Propuesta remains open with people coming into it. And so now with these plaintiffs, we're just dealing with that in our view is not eligible because it's a time-barred claim. So the – so if I understand this correctly, in putting aside all the other classes of people, the problem here is that if these people had sued, if these plaintiffs had sued back in the day when other people sued, they would get treated exactly the same as everyone else, right, who falls in the same class. Right. Whatever was non-time-barred in terms of their principal and interest, we would have the Propuesta for them and engage in a settlement discussion. And we resolve now the vast majority of everything. We're down to minuscule percentages. Right. But the thing that makes them different is precisely the fact that they did not sue and let their claims lapse in your view. Correct. Correct. That their – the statute of limitations prohibits a claim by them, whereas the other – so in – if that were treated as a violation of a Parry-Passu clause, then it would seem to me that in any situation where a debtor is in default and then ultimately is ordered by a court to pay or in the course of litigation arrives at a settlement with the people who sued them, would not be able to assert a statute of limitations claim against people who didn't sue them. Right. Now, that's basically what their argument is. Yes. It would basically strip us of a statute of limitations defense. And in bond documentation, it says it's governed by New York law and provides for jurisdiction in New York courts where, of course, the New York statute of limitations would apply. And I don't even think you could give up your statute of limitations defense ex ante. I think that's contrary to public policy in New York. You certainly can't lengthen it by agreement ex ante. So that's exactly right, Your Honor. And I would also go back for a second on this is there a Parry-Passu claim. Don't forget, to the extent for Bison B, for example, Bison B has two principal claims and interests that accrued in the six years preceding their bringing suit in 2018. We're not here about that, okay? We're here about the rest of their bonds, which matured, you know, years before they brought their statute. Just like Mendoza. And so for those, they have timely claims for principal and interest for the non-time bar claims. So the Parry-Passu claim, they're saying that in 2016 there was a breach of the Parry-Passu clause. That gives them nothing on their non-time bar claims because for a 2016 interest payment that was missed, they have a timely claim to principal and interest. So what they want to bring this theory in is because they say they want to now build the bridge too far and say you violated Parry-Passu in 2016, that means you were subordinating my principal and interest claims. I had a right to those claims regardless of the statute of limitations, so I get a claim for damages, Parry-Passu damages going back to 2002. That's their theory. It's a carbon copy, but using the Parry-Passu clause instead of the until interest is paid clause that was rejected in Mendoza. That's the only reason why we're talking about Parry-Passu damages in this case, which I would say and we say in our brief doesn't even exist as a claim, because really they're just talking about and creating their claim for damages for missed principal and interest. And under their theory, so under their theory, every time someone else gets paid, that means they have a new damages claim that repeats from 2002, 2004. It just keeps re-upping. There's no basis in law for that. So as a matter of the merits, I don't think they've stated a claim for breach of the Parry-Passu clause. I think this Court's decision on what that clause means, four square knocks that out. But then on the statute of limitations point, it just doesn't help them at all get what they're really wanting to get, which is interest payments from 2002 in a lawsuit that they brought in 2018. Mr. Bucuzzi, help me understand the reliance on Aurelius capital, which is cited in your table of authorities as passive. What's the significance in this situation of Aurelius capital? And I'll ask opposing counsel also. Aurelius is significant both because the Court there, just going back to another piece of their acknowledgment argument, Luchesco, in listing statutes that they claim were an acknowledgment of the debt, include the Locke Law and the Sovereign Payment Law from 2014. In Aurelius, this Court said that those laws explicitly prohibited payment to bondholders. So, again, that undercuts that those are somehow acknowledgments. So it's relevant for there, and we cite that in that discussion of the brief. It's also relevant because we think that while it was under the injunction standard, the fact that this Court allowed to proceed the settlements under the propuesta, and that they were settlements, and it talks about settling as opposed to, you know, paying the defaulted debt by its terms, both supports, again, our side of the acknowledgment debate and also undercuts that we're talking about at Parry-Pessu. This Court was vigilant in dealing with this huge amount of litigation, dealing with the Parry-Pessu clause and what it meant. It talks about what it means in 2012 and 2013. And so to me, it just is fundamentally inconsistent to say when it vacated those injunctions, which were premised on a breach of the Parry-Pessu, that it was saying we will now have a new breach of Parry-Pessu that we will let go forward as our basis for vacating the injunctions. Let me ask you a question which is somewhat in the nature of inside baseball. The citation to Aurelius in your briefs is to 644 Federal Appendix 98, page 107 is the pin site. That means it was a summary order. Is that significant, not significant? Relevant, not relevant? I think the summary order situation always confounds me because it is an utterance of this Court, but it also does apply. We have many utterances. As you have heard today, utterances which aren't law. Only law professors claim that their utterances in the area of customary international law constitute law. But our utterances are not law. I would say two things. Number one, it builds on the concepts of the two non-summary opinions, the two opinions in 2012 and 2013, construing what the clause means. It cites back to them. It discusses them. And it doesn't do anything inconsistent. Do you think it's integrated with those earlier published presidential opinions? I think it does. And it's the view of three learned jurists. I used to have a standard footnote when I was a district judge when I cited a summary order from this Court that said something like the views of a distinguished panel of the Court of Appeals are at least as worthy of citation as the views of a second year law student in a note in a law review. Exactly. It may not be binding, but I've also always had trouble with our being able to proclaim that we can stuff these things down the memory hole, that we decide a case one day in favor of one party, and then if an absolutely indistinguishable case comes along later, there's no precedential effect to the thing we did the day before. I think it would look long and hard to see cases where we actually do say, oh, it's just a summary order, so we can, in a totally indistinguishable situation without blinking an eye or giving a reason, treat a different litigant differently. So there are different views about summary orders all around the bar and the court. It is the rule, is it not? What is the rule of the Second Circuit, the extant rule of the Second Circuit, as opposed to the utterances of district judges or circuit judges? I thought they're citable, but the Court just then gives them the weight that they're due, and given that it's a very, in my view, well-reasoned decision, I think it stands a strong authority. And I certainly don't think my adversary is given any basis to refute it. So. We'll hear from them in due course. Okay. Thank you very much. Oh, should I just finish just quickly, because there were those two other points on the 20-year statute of limitations? I've given you extra time, but I'll give you another 60 seconds. Okay. Look, that statute that has the 20-year statute of limitations explicitly lists out categories. None of those categories say a foreign state. A person under the general rule of In re Fox is interpreted by New York courts not to include the government. Interpreting it to include a foreign state would be utterly contrary to the legislative history, which is clear. They wanted to make New York bonds competitive. And so by giving a longer statute of limitations to any kind of State-issued debt, that would undercut that. And finally, if you said person in that statute is any natural or unnatural person. Why would it undercut it? Because that would mean that any bond issued by any State, because now they say a person is anything, would now be subject to the 20-year statute of limitations, whereas in the legislative history they talk about, well, now we're six, New York. We want to go to 20 for the New York debt. Ohio's 15. The Southern State is under. Some are 20. And so now it's to say everybody's 20, where they wanted to have an edge. Which would, I see, would undercut the political objectives of the New York statute. Correct. Correct. Plus also, if you say person is natural or unnatural person, then why do they list public or private corporations? And there's another category as well. So 211 doesn't, no New Yorker has ever found it applies here in this context. And this Court shouldn't follow that lack of authority either. And then on 204, there is no case, there is no New York law that stopped these folks from going into court. So 204 is inapplicable. You need an order of a New York court or New York legislation saying this case can't proceed. We didn't have that here. What Argentina did with their lock law, et cetera, was a starting gun for people to go to court. It wasn't anything that kept people from getting into court. Thank you, Your Honor. Thank you. We'll hear from Mr. Willett. Thank you, Your Honor. The responses to my brother's argument about pari passu are, one, the text. Two, Judge Parker. So start with the text. Mr. Bocuzzi said that the pari passu clause refers to payment obligations. And it does on the external leg, but not on the internal leg. What the internal leg says is that the securities will be held without preference among them. The bonds. And this comes, Judge Lynch, to your point. This can't go on forever under the internal leg because there can only ever be a claim when Argentina is treating other fiscal agency agreement bonds. I'm still having trouble, though. If in any situation where a debtor owes two creditors, right, and doesn't pay either one of them, and there's some sort of pari passu clause as between the two of them, you're saying, in effect, that if one of them sues and ultimately the debtor settles that lawsuit and the other one doesn't until after the statute of limitations has run, the debtor is not allowed to assert a statute of limitations defense because that would treat the two creditors differently. Is that not your idea? No, Your Honor. I'm saying you've just described a most favored nations clause. A new cause of action arises when we have the unusual contractual right, as we do here, of saying we're all in the same boat as fiscal agency agreement bonds. If you treat one of us in one way, you can't classify us differently than others. You can't classify us differently because one sued timely and the other didn't. Or for any other reason. That's what it says. It says all of the securities will be held pari passu and without preference among them. So you don't have to sue to have that contract. You also said, Judge Parker, I assume you mean NML, that decision? Yes, Your Honor. So what are we to make of footnote 10? It says that were Argentina to make such a repurchase, it would not be fulfilling its payment obligations on the security. It would be purchasing them. That's okay. Sure. What are we supposed to make of that footnote 10? You have to reconcile it with what I think is the holding of the case where Judge Parker says, quote, now he's talking about the external leg, but it's parallel language. It prohibits Argentina as bond payor from paying on other bonds without paying on the FAA bonds. Close quote. How do you reconcile those? They can make discrete, strategic, one-off purchases in the marketplace. What they can't do is come and say, we're going to have a global settlement offer that's available to some of the people in the boat, but not the other people in the boat. And the other point that's important to emphasize is that I think my friend is re-arguing a point about the Parry Pass Who clause that Judge Parker expressly rejected. It is not a promise that only applies to formal subordination. In plain words, he rejected that. Any sort of functional re-ranking, which paying one stripe and not paying another is, is a And that's what's happened here now for the first time with regard to the internal leg that was triggered by the 2016 events. And again, there's nothing wrong with the settlement in 2016. What's wrong in 2016 is that they don't offer the settlement to other bonds in the same boat with the same contractual right as the bonds that settled because they didn't sue. Would it be the same if instead of settling, the court ordered the debtor to pay the creditor who had sued, said, yeah, you owe these folks and you should pay. And then the other creditor who had missed a statute of limitations shows up. Would a court order to pay be different? You don't need to reach that, but I think it wouldn't be any different. I think, I think, for one thing, in debt cases, courts don't typically order people to make payments. What they do is they say, we're not going to release this. They enter a judgment saying you have to pay. No, no. Your Honor, I disagree. They entered a judgment saying, we're not releasing this injunction unless you pay. And because they had to release the injunction in order to effect. But that's this case. That's not my hypothetical. My hypothetical is a suit on the debt. I understand. But in a straight suit on the debt, I just get a judgment. Then I have to go enforce it somehow. The court doesn't order the other side to pay. No contempt power in the court if somebody refuses to do it? It's not contempt. It's just a decision that the judgment is owned. I mean, unless I have some specific performance right, which would be unusual in a debt case. The other thing, if I can quickly touch on acknowledgment. My friend raises, very hard to see, two references to document numbers that appear on page 540. It's no harder to see than the line that you're relying on. It's the same line. We need the same glasses, the same contrast in color to read it. You're relying on the part that says Roman V and some words. They're relying on the part in parentheses after. They're equally hard to see. Fair enough. Fair enough, Your Honor. The point is taken. But those references are not to lock laws. They are to decrees offering the option of an exchange. And to come to Your Honor's point earlier about the 12 years, the world has changed in 2017. Those decrees, to the extent Mr. Bocuzzi says, well, the inference from those exchanges is that they're not going to pay bonds because there were lock laws then that don't exchange. Okay. What's changed in 2017? The lock laws are abrogated. There's no more inference. And all those bonds that had not tendered in 2004 and in 2010, 2005 I should say, they've all been paid now in 2016. So by the time we get to this acknowledgment of debt, Argentina has changed its view about the world. It has a different government. It's approaching things in a different way. It's approaching things in the same way vis-a-vis you guys, isn't it? Well, in this litigation. But what it's telling the world, which is the only way you can communicate with your bondholders, is that this is part of its debt. And I'd leave the Court with one question. If they were really not acknowledging this debt, why did they calculate the interest to the penny, to the date that it's due? It's all in here and incorporated in their debt. If there's any question about this, I suggest that a remand of the district court to sort out the arguments we're making would be appropriate. But we think there's a clear showing here that beats the statute of limitations. Thank you. Ms. Smollett. Your Honor, with regard to 211 and Argentina's argument now that this was really a law that was passed only to benefit the State of New York and they didn't want to create any competitive edge to any other sovereign or any other country, I would just note that in passing in the Vigilant case, which we've cited for different propositions about when bonds become due and payable, the bonds at issue there were issued by a municipality in Texas. And the court of appeals said, well, this would qualify for a 20-year statute of limitations, except it's not guaranteed by the full faith and credit of the municipality. It's guaranteed by the full faith and credit of the United States of America. So whatever they said other than that is dictum? It is dictum. But I'm just pointing out that the idea that this was a provincial statute that was only intended to benefit New York municipalities and New York State and we wanted to create a competitive edge is not carried out. Could you help me out on this? I did a lot of looking for cases in which the 20-year statute of limitations is actually applied. Yes, we did a lot of looking, too. Yes, you did. And do you have one? I have not found one. I think basically because usually these bonds get paid. Usually people don't default. Right, people don't default and it doesn't come up. I would also point out with regard to the toll that Argentina now argues, while the toll would only apply if it was a New York statute that said, for example, if New York State were to pass a law that said, we're not going to pay any judgments because we want to save some money for a few years and we're going to start paying again when we get around to it, which is what these statutes said. It's not that we're refusing to pay. It's that it's illegal to pay. But that issue, I would just point out, is very much related to the issue that this Court just referred to the Court of Appeals in Chavez, where the issue of whether the New York courts would recognize a cross-jurisdictional toll where an American pipe toll was created by a punitive class action in Texas. That class action was dismissed, and the issue was whether the Southern District was required to recognize the toll. And that was just accepted by the Court of Appeals last week or two weeks ago. No briefs have been filed that it hasn't been scheduled for argument. But to the extent that this Court feels a concern as to whether or not New York would view an Argentina statute as creating a toll, then I think it's very much related, and I would ask that that issue be referred to the New York Court of Appeals. Any authority to this case, either of these cases, cite Chavez to us as having any relevance to this? Well, I did not. I just found it because Argentina until this morning never raised the issue that it made a difference, that this was an Argentina law, not a New York law. So I did not think it would be relevant. I mean, I knew about it because I was asked to do an amicus brief on the case. But once he raised the issue, I remembered the case. Are you suggesting that Mr. Boccuzzi has never made that argument before? I have not seen it in the brief. I may have overlooked it, but I didn't see it in the brief. If I may, just on the acknowledgment issue, I just wanted to point out the inconsistent positions being taken here. Mr. Boccuzzi says that the reference to the trade provisions by code number, well, you know, if they're included or not. And then at the same time, he says, oh, but these were not hand-delivered to each plaintiff individually. They were just put out in the public where people could see it. Well, that's what creditors are going to look. If I have an Argentina bond, I'm going to look at the quarterly statements, and they're going to be communicating to me. So at a minimum, whether those were actually communicated to the bondholders is an issue of fact. We have cases cited at page 35. So you would look to see if you're going to get paid? If I'm not getting an individual statement mailed to me, then I would look online for the statements, just as I would look on Google to see what that reference means, which is what they're contending that people would do.  Thank you very much. Mr. Boccuzzi, since your argument has been brought into question, if you have an opportunity to respond to the reference to your having raised this issue for the first time here. I don't think it's a new argument. We say the Argentine law, in fact, which was a version of restating the moratorium, was an event of default under 12D of the FAA. So rather than blocking anyone from going to court, it further crystallized any event of default that they wanted to assert. Of course, people started to sue the minute we defaulted in 2001. But my point was simply that the Argentine law didn't stop anyone from going to court. The cases that they cite, I think it's on page 23 or so of their reply brief, all involve New York laws or ordinances or court orders that say, Mr. Smith, you can't go to court right now. And so logically, when Mr. Smith gets to go to court, they didn't count that time against him. The Argentine statute didn't do anything like that. In fact, it did the opposite. It gave people a basis and something to complain about. Thanks, Fred. We'll reserve decision in both of these cases.